**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| |
|---|
| SAMANTHA THERAULT,<br><br>*Plaintiff*,<br><br>v.<br><br>TOWN OF MADISON, CONNECTICUT STATE POLICE OFFICER STANDARDS AND TRAINING COUNCIL, MARC FASANO, and JACK DRUMM,<br>*Defendants*. |

No. 3:23-cv-01301-MPS

**RULING ON MOTIONS FOR SUMMARY JUDGMENT**

**I.      Introduction**

Samantha Therault ("Therault") brings this action against her former employer, the Town of Madison ("the Town"), the Connecticut State Police Officer Standards and Training Council ("the Council" or "POSTC"), Council Director Marc Fasano ("Fasano"), and Madison Police Department Chief John "Jack" Drumm ("Drumm"), alleging they discriminated against her due to her sex and disability; retaliated against her; and violated her Fourteenth Amendment rights to equal protection and due process. The Defendants have moved for summary judgment. For the reasons set forth below, the motions are GRANTED.

**II.      Factual and Procedural History**

**A.  Factual Background**

The following facts are taken from the parties' Local Rule 56(a) Statements and exhibits and are undisputed unless otherwise indicated. I discuss only those facts necessary to decide the defendants' motions.

In February 2021, Therault applied to work for the Town of Madison Police Department ("MPD"). ECF No. 100-2 ¶ 1. Therault had previously worked as a judicial marshal and an

1

AMTRAK police officer. *Id.* ¶ 5. On April 12, 2021, MPD made her a conditional offer of employment. *Id.* ¶ 2. The MPD offer was contingent upon Therault's successful completion of "any [Council] mandated comparative certification requirements." *Id.* ¶ 3. Comparative certification allows an applicant who has served as a police officer outside of Connecticut to transfer her training from that jurisdiction to avoid having to conduct the same training as a recruit with no prior policing experience. *Id.* ¶ 6. In lieu of comparative certification, an officer must complete a training course through the Council's Police Academy and at least 400 hours of field training by her sponsoring police department. *Id.* ¶ 7. An officer is considered a probationary candidate until she has completed these requirements and has one year from her swearing-in date to do so, unless the Council grants the candidate an extension.[1] Regs., Conn. State Agencies § 7-294e-1(a)(2); Conn. Gen. Stat § 7-294d(a)(5); ECF No. 99-2 ¶ 4. Whether a probationary candidate receives comparative certification or not, any officer who wishes to serve the MPD must receive certification from the Council, as certification is required to carry out essential police functions, such as carrying a firearm. ECF No. 100-2 ¶¶ 10–11.

MPD sponsored Therault in seeking her comparative certification, but the Council denied it. *Id.* ¶ 9. Accordingly, Therault was required to complete all the Connecticut training requirements for a new recruit. *Id.* ¶ 13. Training through the Police Academy entails classroom and field modules, as well as physical training, conducted over about six months. *Id.* ¶ 14. Some of these modules require physical activity. *Id.* ¶ 15. To successfully pass each module, recruits are required to demonstrate their competency once every lesson has been completed. *Id.* ¶ 16. To

---

[1] The Town, Drumm, and Therault misstated Section 7-294e-1(a)(2) in the 56(a)(2) statement. *Compare* ECF No. 100-2 ¶ 8 ("After a recruit completes these requirements, she is considered a probationary candidate") *with* Regs., Conn. State Agencies § 7-294e-1(a)(2) ("'Probationary candidate' means a police officer who, having satisfied pre-employment requirements, has commenced employment with a law enforcement unit, *but has not satisfactorily completed the training requirements* provided for in section 7-294d of the Connecticut General Statutes") (emphasis added).

graduate from the Police Academy, each recruit is required to complete a final comprehensive test at the end of the six-month session. *Id.* ¶¶ 17–18. Recruits also must pass two physical fitness tests called the "Cooper standard." ECF No. 99-2 ¶ 2 (Council certification requires passing two physical fitness tests administered during the Academy by achieving a minimum score); *see also* ECF No. 91-7 at 16 ("A recruit who fails to meet the required 40th percentile of the Cooper standard on the initial assessment will result in immediate dismissal from the academy, unless pre-certified. In addition, all recruits are required to improve to meet the 50th percentile of the Cooper standard on final assessment and must pass the Exit Agility Test."); *see also id.* at 18; *see also* Regs., Conn. State Agencies § 7-294e-16(o) ("The Police Officer Standards and Training Council requires, as a condition for continuing participation in a Council accredited basic training program that the candidate be tested for physical fitness at two further separate times during the police officer basic training program and achieve a score, in each individual test, at least as high as the minimum acceptable percentile for each individual test, using the minimum acceptable score for each test, as set by the Council"). For the MPD, post-Academy field training takes about fourteen to sixteen weeks to complete. ECF No. 100-2 ¶ 19.

On September 8, 2021 MPD hired Therault and swore her in. *Id.* ¶ 20. Accordingly, she had until September 8, 2022 to complete the requirements under state law. *Id.* ¶ 62. At all relevant times, Therault was a probationary candidate. ECF No. 99-2 ¶ 7. She entered the Police Academy – "Session 373" – on September 9, 2021. ECF No. 100-2 ¶ 21. When Therault was hired, she represented that she did not have a disability and was fully cleared to participate in training by her physician. *Id.* ¶¶ 4, 22. Following a request for modified physical training exercises, Therault was again re-cleared by her physician for physical training at the Academy at the end of September. *Id.* ¶ 23.

On November 12, 2021, Therault injured her left knee during a physical training session. *Id.* ¶ 24. At the time of her injury, Therault was not certified as a police officer. *Id.* ¶ 86; *see also* ECF No. 99-2 ¶ 7. She reported the injury to MPD Sergeant Jeremy Yorke ("Yorke"), who instructed her to get treatment at Middlesex Health; Therault complied. ECF No. 100-2 ¶ 25. The provider instructed: "Limited use of leg (left) until seen by occupational health." *Id.* On November 13, 2021, Therault filed a workers' compensation claim for this injury, which the Town did not dispute. *Id.* ¶¶ 26–28. Over the following three weeks, Therault returned to Middlesex Health for subsequent treatment and evaluation. *Id.* ¶ 30. Following each visit, Therault's restrictions on using her left leg did not change, and were: "Limited duty . . . Frequent sitting, occasional standing/walking (as needed for comfort or positional change). May lift up to 10lbs while seated." *Id.* ¶¶ 30, 32. Therault faxed doctors' notes from each of these visits to MPD. *Id.* ¶ 31. On November 15, 2021, Therault returned to the Police Academy and provided the doctor's note with her restrictions to the Council instructors. *Id.* ¶ 34. As of November 2021, it was unknown whether Therault would complete that session of the Academy. *Id.* ¶ 33.

Therault's injury and her restrictions prevented her from participating in the physical components of certain training sessions at the Academy. *Id.* ¶¶ 35–36. Her injury and restrictions also prevented her from participating in the final comprehensive test that is required to graduate from the Police Academy. *Id.* ¶ 37. Therault, however, continued to attend the Police Academy. *Id.* ¶ 38. For some sessions, she was physically present but not allowed to participate in physical activity and was marked absent by instructors. *Id.*

Under state regulations, a recruit who misses more than 40 hours of training at the Police Academy is dismissed from that session. ECF No. 99-2 ¶ 15 (citing Regs., Conn. State Agencies § 7-294e-15). The regulations further state that the recruit will be required to repeat the entire

program in a subsequent training session if allowed to do so by the recruit's department. *Id*. The Police Academy had a long-standing practice of marking a recruit absent if that recruit was unable to participate in a required task due to injury or illness. *Id*. ¶¶ 18–19. Council Director Fasano was required to inform the sponsoring police agency if a recruit failed to complete the required training. *Id.* ¶ 26.

When Therault amassed twenty hours of absences, she spoke with a training officer and Council Director Fasano. *Id.* ¶ 21, 23. When she amassed forty hours of absences, she texted a MPD Sergeant: "I hit my 40 on Friday. I'm leaving the doctor's now . . . I don't have any definitive answers from [the Council] but it sounds like they're leaning towards recycling because of the hours. My limitations have not changed. I have been referred to an orthopedic. What do you want me to do?" *Id.* ¶ 40. The Sergeant replied, "Are they letting you continue with training?" to which Therault answered "I don't know. [The Council] is strict on the 40. The doctor's limitations haven't changed . . ." *Id.* ¶ 41.

The Council ultimately recorded Therault as missing over forty hours of Police Academy training and communicated to MPD on December 7, 2021, that due to these absences, Therault was dismissed from the Academy effective December 8, 2021. *Id.* ¶¶ 28, 42; ECF No 100-2 ¶¶ 41–42. On December 8, 2021, MPD Chief Drumm terminated Therault's employment with MPD. ECF No. 100-2 ¶ 43. The termination letter stated that the MPD would keep her application on file for one year and invited her to apply for any future openings at the MPD for which she was qualified. ECF No. 92-4 at 65. As of December 8, 2021, Therault did not know how long she would be subject to the physical restrictions. ECF No. 100-2 ¶ 44. Likewise, when it terminated her, MPD did not know when Therault would become physically able to complete the Council

certification requirements. *Id.* ¶ 45. As of her termination, Therault had not provided MPD with an estimated time frame within which she would be able to return to the Police Academy. *Id.* ¶ 46.

If a recruit does not successfully complete a Police Academy session, she may be permitted to "recycle," which allows her to attend a subsequent Academy session if her police department continues to sponsor her. ECF No. 100-2 ¶ 50. It is up to the sponsoring law enforcement agency that employs the recruit to decide whether to sponsor that recruit to attend a future Police Academy session. ECF No. 99-2 ¶ 26. A recruit must be employed by a Connecticut law enforcement agency to be eligible to attend the Academy. *Id.* ¶ 4. A recruit who is "recycled" is required to repeat the entire Basic Training Academy Program in a subsequent training session. ECF No. 100-2 ¶ 50. The parties dispute whether Therault ever requested MPD to allow her to recycle to the next training session. *Id.* ¶ 51; ECF No. 99-2 ¶¶ 21–22. Therault would be able to recycle only once she had her physical restrictions lifted. ECF No. 100-2 ¶ 52.

Therault never requested MPD to allow her to perform light duty while she was injured. *Id.* ¶ 51.[2] Light duty tasks may involve any duty within the MPD that does not require a weapon, badge, or the use of force and arrest powers. *Id.* ¶ 56. The availability of light duty work depends on the needs of the MPD. *Id.* MPD's light duty policy provides that an officer may use a maximum of 60 days of light duty service in a two-year period. *Id.* ¶ 54. Therault did not know how long she would have needed to be on light duty. *Id.* ¶ 55. In the last ten years, no non-certified officer has been provided with light duty service at MPD. *Id.* ¶ 59.

---

[2] Therault responded to ECF No. 100-2 ¶ 51 with: "Denied as characterized" but only addressed the Town's 56(a)(1) Statement about recycling, not light duty. Local Rule 56(a)2 requires that "[a]ll denials must meet the requirements of Local Rule 56(a)3." Under Local Rule 56(a)3, "[f]ailure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence . . ." Accordingly, because the Town's 56(a)1 Statement that Therault "did not request Madison Police Department to allow her to . . . perform light duty" is supported by the evidence (ECF No. 92-3 at 64) and Therault's denial did not even address the Town's Statement about light duty, I deem that portion of ¶ 51 regarding "light duty" admitted.

Since 2019, MPD has hired 15 male officers, nine of whom were required to complete training at the Police Academy. *Id.* ¶ 74. Since 2019, MPD has hired two female officers, both of whom successfully completed Police Academy training and are now Council-certified officers. *Id.* ¶ 75. None of these recruits sustained a significant injury during their training that prevented them from completing substantial portions of that training. *Id.* ¶ 76. While at the Police Academy, one female recruit was unable to successfully complete the physical fitness test required to graduate from the Academy. *Id.* ¶ 77. The Council permitted her to graduate and begin her field training period under the condition that she pass the physical fitness test within one year of her swearing-in date. *Id.* MPD provided that recruit with morning training sessions led by a certified fitness instructor. *Id.* ¶ 78. Following three to four months of training, the recruit passed the physical fitness test within the required timeframe and is now a Council-certified officer. *Id.*

MPD has had a Council-certified Sergeant become injured during his employment, which caused him to be unable to perform his police duties. *Id.* ¶¶ 79–82, 84. The Sergeant took a medical leave of absence while he recovered from those injuries. *Id.* ¶ 83. Throughout his leave of absence, his certification remained active. *Id.* ¶ 85. The Sergeant returned to work full duty and was able to fulfill all duties of a police officer under state law; he was never placed on light duty in connection with the injury. *Id.* ¶¶ 87–88.

The Police Academy's Rules and Regulations describe an evidentiary hearing process for recruits to challenge their dismissal. ECF No. 99-2 ¶ 49. At this administrative hearing, recruits can present evidence and be represented by counsel. *Id.* ¶ 51. Therault never sought such a hearing. *Id.* Therault also had the right to petition for a declaratory ruling regarding how her attendance was calculated. *Id.* ¶ 50 (citing Regs., Conn. State Agencies § 7-294e-5). Therault did not exercise that

right. *Id.* Therault also never complained of or appealed her termination to the Madison Board of Police Commissioners. ECF No. 100-2 ¶ 66.

In February 2022, Therault needed surgeries to treat her knee injury; she had additional restrictions following the surgery. *Id.* ¶ 67. Her termination letter dated December 8, 2021 stated that her application would be kept on file for one year and invited her to re-apply for any future openings with MPD for which she would be qualified. *Id.* ¶ 47. Therault did not reapply to MPD. *Id.* ¶ 49; ECF No. 99-2 ¶ 54. In 2025, Therault became physically able to complete the requirements of a police officer, ECF No. 100-2 ¶ 69,[3] and as of September 2025, Therault no longer considered herself disabled and no longer had any limitations on the knee she had injured during the Police Academy. *Id.* ¶¶ 70, 72. As of September 2025, Therault had not applied to be a police officer for any other department in Connecticut. *Id.* ¶ 71. Her subsequent employment following her termination from the Town has not required physical activity. *Id.* ¶ 73.

## B. Procedural History

The Court assumes familiarity with the procedural history of this case as set forth in the Ruling on Motions to Dismiss, ECF No. 72, and the parties' briefs. By way of brief summary, the Ruling on Motions to Dismiss permitted only the following claims to proceed through discovery and dismissed the remaining counts:

- Against the Council: Count Eight for discrimination in public accommodations under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*;
- Against the Town:
  - o Count Two for disability discrimination and failure to accommodate under Title I of the ADA;
  - o Count Six for sex discrimination under the Connecticut Fair Employment

---

[3] Therault's statement that "she began filling out law enforcement applications again in 2024," ECF No. 100-2 ¶ 69, does not rebut the Town's assertion that she did not become physically able to complete the requirements of a police officer until 2025. Therault also cites no evidence in support of this statement, which means that I may deem the Town's assertion admitted. *See* D. Conn. L.R. 56(a)(3).

8

Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(b)(1);

o Count Nine for retaliation under the Connecticut Workers' Compensation Retaliation Act ("CWCRA"), Conn. Gen. Stat. § 31-290a;

- Against Drumm: Count Twelve for violation of equal protection under 42 U.S.C. §1983; and
- Against Fasano: Count Eleven for violation of due process under 42 U.S.C. §1983.

ECF No. 72 at 34. The defendants have moved for summary judgment on all remaining counts. ECF Nos. 91 (the Council and Fasano); 92 (the Town and Drumm).

## III.    Legal Standard

Summary judgment will be granted only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (internal quotation marks omitted). It is the movant's burden to "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the movant meets its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Even then, summary judgment is proper only where "the record taken as whole could not lead a rational trier of fact to find for the non-moving party." *Id.*

In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). But "credibility determinations, the weighing of the evidence, and the drawing of legitimate

9

inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## IV. Discussion

### A. Count Eight

The Council moves for summary judgment on Count Eight, which alleges discrimination in public accommodations under Title II of the ADA. ECF Nos. 91 at 1–2; 91-2 at 13–30. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A qualified individual with a disability is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for . . . participation in programs or activities provided by a public entity." *Id.* § 12131(2). A public entity includes a state or local government body or any instrumentality thereof. *Id.* § 12131(1). Discrimination in violation of the ADA includes, among other things, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Id.* § 12112(b)(5)(A).

Because the Council contends that Therault's ADA claim is barred by sovereign immunity under the Eleventh Amendment, ECF No. 91 at 27–30, and that analysis involves determining whether Therault has raised a material dispute of fact as to whether the Council violated Title II of the ADA, I analyze the Title II claim within the sovereign immunity framework.

The Eleventh Amendment to the Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any

Foreign State." U.S. Const. amend. XI. "[T]the Supreme Court has interpreted the Eleventh Amendment to extend to suits by all persons against a state in federal court." *T.W. v. New York State Bd. of L. Examiners*, 110 F.4th 71, 79 (2d Cir. 2024). The Eleventh Amendment "bars suits against states even where the state is not named a party to the action" and "applies to a suit for damages brought against an entity that is fairly considered to be an arm of the state." *Id.* at 79–80 (quotation marks omitted). Here, it is undisputed that the Council is considered a state agency protected by the Eleventh Amendment. *Cullen v. Mello*, 2024 WL 1904571, at *1 (2d Cir. May 1, 2024) ("The Police Officer Standards and Training Council ("POSTC") is a Connecticut state agency"); *see also* Conn. Gen. Stat. § 4-141(4) ("'State agency' includes every department, division, board, office, commission, arm, agency and institution of the state government, whatever its title or function").

> Section 5 of the Fourteenth Amendment grants Congress authority to abrogate state sovereign immunity. But Section 5 only grants Congress the authority to abrogate states' immunity as to conduct that actually violates the Fourteenth Amendment, as well as a somewhat broader swath of conduct that is constitutional but which Congress may prohibit in order to remedy or deter actual violations. When an exercise of Section 5 enforcement power is directed in a prophylactic way, there must be congruence and proportionality between the violation to be prevented or remedied and the means adopted to that end.

*T.W.*, 110 F.4th at 81 (internal citations, quotation marks, and alterations omitted).

"Congress has unambiguously purported to abrogate states' immunity from Title II claims. Title II, however, sweeps more broadly than the Fourteenth Amendment." *Id.* (internal citations and quotation marks omitted). To determine whether a Title II abrogation is valid, courts proceed on "on a claim-by-claim basis," considering "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment,

whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *United States v. Georgia*, 546 U.S. 151, 159 (2006).[4]

### i. Step One: Title II Violation

The first step of the *Georgia* framework requires me to identify "which aspects of the State's alleged conduct violated Title II." *Id.*

"Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 [ ] (1973)." *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009); *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 112 (2d Cir. 2001) ("plaintiff may rely on a burden-shifting technique similar to that adopted in *McDonnell Douglas Corp. v. Green*" to establish Title II violation). "A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [challenged action]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *McBride*, 583 F.3d at 96.

To establish a prima facie case for her Title II claim, Therault must demonstrate: "(1) that she [was] a qualified individual with a disability; (2) that she was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public

---

[4] The Council's argument rests primarily on the first step of the *Georgia* analysis. ECF Nos. 91-2 at 29, 103 at 6–8. Although the Council did not thoroughly brief steps two or three of the *Georgia* analysis, it did make arguments as to both those steps. ECF No. 91-2 at 29 (arguing that "the case does not implicate a fundamental right" and "the application of Title II to a case involving the Academy's training on the basis of disability is outside the scope of Congress' Section 5 power."). The Council also cited the Second Circuit's leading case on the abrogation analysis, *T.W.*, 110 F.4th 71, in its memorandum of law. ECF No. 91-2 at 28. Therault, in response, provided arguments addressing all three *Georgia* steps. ECF No. 99 at 13–14, 16 (arguing that Therault has raised a genuine dispute of material fact as to the merits of the Title II claim; the Council's actions fail the rational basis test; and "[e]ven if the Court ultimately reaches the third prong, Defendants are not entitled to summary judgment on this record where the claim concerns exclusion from a state-run certification/training program that serves as a gateway to government employment and implicates a liberty interest in one's chosen profession").

entity; and (3) that such exclusion or discrimination was due to her disability." *Tardif v. City of New York*, 991 F.3d 394, 404 (2d Cir. 2021). "A plaintiff may base her Title II claim on any of three theories of liability: disparate treatment (intentional discrimination), disparate impact, or failure to make a reasonable accommodation." *Id.* Therault bases her Title II claim on the theory of failure to make a reasonable accommodation. ECF No. 36 ¶ 130.

"[T]he showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment is de minimis." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203-04 (2d Cir. 1995) (internal quotation marks omitted). "However, it is not non-existent and summary judgment must be granted whenever the undisputed facts, viewed most favorably to the non-moving plaintiff, do not make a prima facie case." *Robles v. Cox & Co.*, 987 F. Supp. 2d 199, 206 (E.D.N.Y. 2013) (internal quotation marks and alterations omitted). The Council concedes only that it is a public entity and argues that Therault cannot establish any of the remaining elements of her prima facie claim. ECF No. 91-2 at 16.

### *Disability*

The Council contends that Therault has not established that she had a disability. *Id.* The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . ." 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). "Not every impairment is a 'disability' within the meaning of the ADA; rather, there are two requirements: the impairment must limit a major life activity and the limitation must be substantial." *Capobianco v. City of New York*, 422

F.3d 47, 56 (2d Cir. 2005). "Factors to consider in determining whether a major life activity is substantially limited include: the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact." *Id.* at 57. "The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard." 28 C.F.R. § 35.108(d)(1)(i); *see also* 42 U.S.C. § 12102(4)(A) ("The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.").

The facts, viewed in the light most favorable to Therault and under the ADA's broad construction of "disability" and "substantially limits," establish that Therault had a disability during the relevant time period. Therault's knee injury required "[f]requent sitting, [and only] occasional standing/walking (as needed for comfort or positional change)." ECF No. 100-2 ¶ 32. She could only "lift up to 10lbs while seated." *Id*. Her contemporaneous incident report detailed that she "could not put any weight on the left knee" and needed assistance. ECF No. 91-13 at 4. Further, her physical limitation records detailed that she "has an acute knee injury" and "should not have any prolong[ed] standing or walking"; and "no impact to the knee." *Id.* at 7–8. Viewed in the light most favorable to Therault, these facts are sufficient to find that Therault's injury substantially limited the major life activities of standing, walking, and lifting. *See* 28 C.F.R. § 35.108(d)(1)(ii) ("the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis.").

The Council contends that Therault did not have a disability under the ADA because her knee injury was not permanent and because she "does not even make any allegations regarding the possible duration of this injury." ECF No. 91-2 at 17–19. But the Second Circuit has rejected this

argument and held that "a short-term injury *can* qualify as an actionable disability under the ADA. In other words, a plaintiff's actual disability claim under the ADA does not fail solely because [s]he failed to state that h[er] disability will be permanent or chronic . . . or indicate the duration or long-term impact of h[er] impairment such that the Court may infer that h[er] injury was not temporary." *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 93–94 (2d Cir. 2021) (brackets, quotation marks, and footnote omitted); *see also* 28 C.F.R. § 35.108(d)(ix) ("The effects of an impairment lasting or expected to last less than six months can be substantially limiting . . . for establishing an actual disability or a record of a disability"); *see also* 42 U.S.C. § 12102(4)(A) ("The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.").

### *Qualified Individual*

Next, the Council contends that Therault was not a qualified individual because the undisputed facts demonstrate that, as a result of her knee injury, she could not and did not participate in all of the Academy's physical training components, and it is "simply *not* a 'reasonable accommodation' for the Plaintiff 'to not physically participate in those training courses that required significant physical [exertion].'" ECF No. 91-2 at 21.

Because the ADA defines a qualified individual with a disability as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for . . . participation in programs[,] " 42 U.S.C § 12131(2), the determination of whether Therault is a qualified individual depends on whether she could meet the essential eligibility requirements for a candidate at the Council's Police Academy with or without reasonable modifications. The Council suggests that some level of physical fitness was essential and points to the fact that the Academy "provides physical training to recruits"; "requires

15

physical fitness"; and requires recruits to meet certain benchmarks on physical fitness tests, ECF No. 91-2 at 23–24, including passing two "Cooper standard" tests at the beginning and end of the Academy. ECF No. 91-7 at 16. But this does not establish that that no accommodations to the Academy's physical training program or absence policy would have been reasonable. And the Council does not contend that Therault failed to meet the required 40th percentile of the Cooper standard on the initial assessment, or that she was ever administered the final assessment. *See* ECF No. 91-2 at 24. The most essential eligibility requirement the Council identifies is being employed by a Connecticut law enforcement agency, which Therault met at the time of the Council's alleged failure to accommodate her. *Id.* at 24–26 & n.11; ECF No. 99-2 ¶¶ 28–29; ECF No. 100-2 ¶¶ 20, 41–43.

Whether an accommodation is reasonable is generally a question for the jury, especially where, as here, there are no facts to suggest that the defendant took any steps to accommodate the plaintiff's disability. *See Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) ("The reasonableness of an employer's accommodation is a fact-specific question that often must be resolved by a factfinder. But in a case such as this, in which the employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is plainly reasonable.") (internal citation and quotation marks omitted). "[A] plaintiff alleging a failure to accommodate a disability bears the burdens of both production and persuasion as to the existence of some accommodation that would allow the plaintiff to meet the essential requirements of the service, program, or activity at issue." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 190 (2d Cir. 2015). The plaintiff also bears a "light burden of production as to the facial reasonableness of the accommodation." *Id.* (internal quotation marks omitted).

Here, Therault has met this "light burden of producing evidence as to the facial reasonableness or plausibility of the accommodation," *id.,* because she has pointed to facts demonstrating that the Council once allowed her to complete a "modified work out plan" after her knee was injured and "restored" those hours to Therault after she initially "missed" them. ECF Nos. 99-2 ¶¶ 19 (response), 65; 91-11 at 2 ("Since the start of the academy, Recruit Therault has missed a total of 48.75 hours. 2.75 hours were restored due to the recruit receiving training materials from the instructor and the recruit completing a modified work out plan reducing her missed hours to 46."; "November 17th, 2021 . . . Physical Training (completed modified workout)"); ECF No. 100-2 ¶ 24 (Therault injured her left knee on November 12, 2021). At her deposition, Therault testified that she "asked for modified exercises . . . that would affect the knee." ECF No. 99-1 at 2. When asked what exercises she sought modifications for, she testified: "I wasn't able to do flutter kicks so could I do push-ups?" *Id.* She also testified that she "asked for modified PT [physical training]." *Id.* Viewing this evidence in the light most favorable to Therault, a reasonable jury could find that the Council *was* able to offer some accommodations to its rigid policy of treating candidates with injuries who attend sessions but cannot physically participate in them as "absent."  These potential accommodations include allowing recruits to complete "modified work out[s]," ECF No. 91-11 at 2, or allowing recruits time to recover and the ability to complete the physical training requirements at a later date to have absences "restored," *id*.

Because I have found that Therault "has met the light burden of producing evidence as to the facial reasonableness or plausibility of the accommodation, the burden falls to the [Council] to persuade the fact-finder that the proposed accommodation is unreasonable." *Dean*, 804 F.3d at 190. The Council may meet that burden by demonstrating that the potential accommodations "(a) impose undue hardship on the operation of the defendant's service, program, or activity, or (b)

17

require a fundamental or substantial modification to the nature of its . . . program or standards." *Id.* The Council argues that "the requested accommodation of not participating in the required physical training and testing is not reasonable." ECF No. 91-2 at 24. But the Council misstates Therault's identified accommodations and has not otherwise demonstrated that modified workouts or time to recover and later complete physical training requirements would impose an undue hardship on the Council's Police Academy or fundamentally modify the nature of the Academy. Accordingly, I find that the Council has failed to meet its burden of persuasion.

The Council also contends that it "is not liable for failure to provide a reasonable accommodation when the Plaintiff did not engage in . . . that interactive process." ECF No. 91-2 at 22. The Council contends that "the only accommodation [Therault] proposed was possibly attending a new training session – which was not within [the Council]'s control." *Id.* at 23. But the record, when viewed in the light most favorable to Therault, contradicts the Council's assertion and suggests that Therault requested accommodations that were in the Council's control, such as modified exercises. ECF No. 99-1 at 2. Further, because the Council knew that Therault had a knee injury, it had an obligation to assess whether it could reasonably accommodate her injury, regardless of whether Therault requested any specific accommodation. *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) ("We therefore hold that an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious—which is to say, if the employer knew or reasonably should have known that the employee was disabled."). Specifically, the Council "was obligated to engage in" an "interactive process" with Therault to "work together to assess whether [her] disability [could] be reasonably accommodated." *Id.* at 135–36.

The Council also argues that Therault was not a qualified individual because, to attend the Police Academy, a recruit must be employed by a Connecticut law enforcement agency. ECF No.

18

91-2 at 24. The Council argues that when she was no longer employed by MPD, she did not meet the essential eligibility requirements for the Academy. *Id.* at 25. This argument fails because the relevant period to examine whether the Council failed to make a reasonable accommodation for Therault was while she was attending the Academy, which was before she was fired by the MPD, not after. ECF Nos. 99-2 ¶¶ 28–29; 100-2 ¶¶ 41–43. That she was later fired by the MPD has no bearing on whether Therault was a qualified individual when she was a recruit at the Academy. Accordingly, the Court cannot grant summary judgment to the Council on the basis that Therault was not a qualified individual.

### *By Reason of Her Disability*

Therault's ADA claim requires her to prove that the alleged "exclusion or discrimination was due to her disability," *Tardif*, 991 F.3d at 404. The Council argues that Therault cannot meet her burden on this element because the Council dismissed her from the Academy "based on absences" under the state regulation requiring that any recruit who misses more than 40 hours of training be dismissed, and not because of her disability. ECF No. 91-2 at 27. This argument does not warrant summary judgment because the evidence, when viewed in the light most favorable to Therault, would allow a reasonable jury to conclude that the Council failed to accommodate, and ultimately dismissed, her because of her disability.

The regulation[5] requiring dismissal of recruits who miss more than 40 hours of training states:

> (a) **Attendance in basic training programs.** Probationary candidates shall not be absent from any basic training program for more than five training days, or the

---

[5] In this portion of its brief, the Council erroneously cites § 7-294e-7, which pertains to "law enforcement instructor certification." In the Council's Local Rule 56(a) Statement, as well as in other portions of its brief, the Council cites to § 7-294e-15 when discussing the state regulation requiring dismissal of candidates who are absent for 40 hours of training, and the Court presumes that the Council meant to cite that provision here.

> equivalent. Probationary candidates who are absent for more than five training days shall be dismissed.

Regs., Conn. State Agencies § 7-294e-15. The regulation does not define the term "absent," and therefore does not require that the Council mark recruits who are physically present "absent" when they are limited in physical participation due to injury. It also does not prohibit the Council from allowing absences to be "made up" or hours "restored," which, as previously discussed, the Council did for Therault on one occasion. ECF No. 91-11 at 2. And the regulation does not prohibit allowing recruits to complete physical training with modified exercises or giving them partial credit for attending and extra time to complete essential, physically demanding classes. A reasonable jury could determine that the Council had the ability to offer modified physical exercises; credit attendance through different means; and allow recruits time to later make up "missed" sessions and have their hours restored.

Further, a reasonable jury could find that the alleged exclusion or discrimination was "due to" Therault's disability because her recorded absences were expressly attributed to her inability to physically participate in certain physical training components. ECF No. 91-14 at 2 (December 6, 2021 email from Training Officer to Fasano describing sessions Therault "sat out [of] . . . due to her physical limitations" and calculating that they totaled 26 hours); ECF No. 91-10 ¶ 37 (Fasano affidavit stating that "any recruit prior to Therault, who *like her,* missed more than forty (40) hours of training *due to an injury* . . .") (emphasis added). A reasonable jury could find that Therault's knee injury and the Council's refusal to provide the accommodations described above directly resulted in her being marked absent and subsequently dismissed from the Academy.

Therault has raised a genuine issue of material fact as to whether the Council violated Title II by failing to make a reasonable accommodation for her disability. As a result, I proceed to the second *Georgia* factor.

20

### ii. Step Two: Fourteenth Amendment Violation

The second step of the *Georgia* framework requires me to identify "to what extent such misconduct also violated the Fourteenth Amendment." *Georgia,* 546 U.S. at 159. State discrimination on the basis of disability is subject to rational basis scrutiny. *T.W.*, 110 F.4th at 90; *Riccio v. Examsoft Worldwide, Inc.*, 794 F. Supp. 3d 73, 91 (D. Conn. 2025). Under the rational basis test, I must find that the Council's failure to accommodate Therault was constitutional so long as "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Riccio*, 794 F. Supp. 3d at 91.

I find that in the context of the Police Academy, it is rational for the Council to have an attendance policy that marks absent candidates who are unable to fully participate due to injury in tasks requiring a physical component. ECF No. 99-2 ¶¶ 18–19. The Academy's training includes field modules and physical training, some of which require physical activity. ECF No. 100-2 ¶¶ 14–15. Recruits are required to demonstrate their competency once every lesson has been completed to pass each module. *Id.* ¶ 16. To pass the Police Academy itself, each recruit is required to complete a final comprehensive test at the end of the six-month session. *Id.* ¶¶ 17–18. Recruits also must pass two physical fitness tests called the "Cooper standard." ECF No. 99-2 ¶ 2; *see also* ECF No. 91-7 at 16 (recruits must meet 40th percentile of the Cooper standard on initial assessment and 50th percentile of the Cooper standard on final assessment). Because the Academy's training, competency checks, and tests require physical activity, it is not irrational for the Council to mark absent candidates who are physically present but cannot, due to injury, participate in a training module that requires physical participation.

I also find that the Council's apparent decision not to allow Therault to complete modified workouts or modified physical training requirements for the sessions for which she was marked absent was rational. Many of the sessions for which Therault was marked "absent" plainly involved

physical activity, such as "physical fitness," "arrest and control," "handcuffing," "use of less lethal force (baton)," and "building search/active aggressor." ECF Nos. 91-9 at 2; 91-11 at 2–3. Further, in his affidavit, Fasano swore that the Academy's program includes "high impact takedowns and techniques involving manipulation of body parts." ECF No. 91-10 ¶ 13. Therault has not provided details as to what training sessions could have been modified and how such modifications would still achieve the Council's training goals. Therault argues that the Council's "own application of its policy was internally incoherent in a way that undermines any claim of rationality" because the Council restored 2.75 hours (but not more) to Therault and allowed her to participate in some sessions that involved physical activity, but not others. ECF No. 99 at 14–15. She also suggests that the Council's requirement that dismissed recruits who seek to recycle must be sponsored by an employing police department is irrational. Therault does not demonstrate, however, that these decisions were irrational, "inconsistent," or "without articulable criteria," *id.,* and therefore fails to meet her burden to negate "every conceivable basis which might support" the Council's actions. *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364 (1973). Therault has not shown that the Council's restoration of only 2.75 hours of absences or allowing her to participate in some sessions but not others had no plausible justification based on (among other possibilities) the nature or intensity of the training sessions, the availability of adequate alternative physical exercises or tasks, or the availability of instructors to supervise that training. For example, Therault does not explain how an exercise involving "high impact takedowns" could have been modified to accommodate her knee injury while still resembling real-life scenarios confronting police officers enough to retain its value as a training exercise. Nor has she shown that it is irrational to require Police Academy recruits to secure a probationary position with an employer-police department before occupying a place at the Academy. *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307,

22

313–15 (1993) (an action subject to rational basis review "comes to us bearing a strong presumption of validity" and "must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. . . . In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."). Accordingly, I find that the Council had a rational basis for not offering Therault modifications for every training session that she could not participate in due to her knee injury given the physical nature of the Police Academy's training sessions.[6]

Because I have found that the Council's conduct did not violate the Fourteenth Amendment, I proceed to the third *Georgia* factor.

### iii.  Step Three: Abrogation Analysis

Because I have found that the Council may have violated Title II but did not violate the Fourteenth Amendment, I next examine the third *Georgia* factor, which considers "whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Georgia*, 546 U.S. at 159. In the Second Circuit, the abrogation analysis requires a court to: "(a) identify the scope of the constitutional right at issue; (b) examine whether, in enacting Title II, Congress identified a history and pattern of unconstitutional discrimination by states in the relevant context; and (c) determine whether the right and remedies created by the statute are congruent and proportional both to the constitutional rights it purports to enforce and to the record of violations adduced by Congress." *T.W.*, 110 F.4th at 82.

---

[6] Therault's remaining arguments as to the constitutionality of the Council's actions are of no help to her here. Only the Town, not the Council, could sponsor Therault to recycle. ECF No. 99-2 ¶ 26. And the Council's failure to accommodate Therault's knee injury—the Title II violation at issue here—is wholly distinct from the alleged procedural due process issue that forms the basis of Therault's stigma-plus claim, which, in any event, lacks merit, as shown below.

### *Scope of the Right at Issue*

As to the scope of the constitutional right at issue, whether framed as the right to obtain state police officer certification or the right of a disabled person to attend the Police Academy, neither right is subject to heightened scrutiny. *T.W.*, 110 F.4th at 85 ("In sum, the right at issue here—a disabled person's right to practice her chosen profession—is not afforded heightened scrutiny."); *id.* at 90 ("restrictions related to professional licensing are subject only to rational basis review, as are classifications on the basis of disability.").

### *History and Pattern of Unconstitutional Discrimination*

In enacting Title II, the Second Circuit has found, "Congress has not identified a longstanding pattern of disability discrimination in [the context of] professional licensing." *T.W.*, 110 F.4th at 85 (quotation marks omitted). The Second Circuit's "review of the legislative history uncovered no legislative findings documenting a pattern of unconstitutional discrimination in the administration of professional licensure examinations by states, in the granting of professional licenses, or regarding occupational choice more generally." *Id.* It called the "congressional record of unconstitutional state conduct in the occupational choice and professional licensing context . . . perilously slim." *Id.* at 87.

In cases concerning police officer certifications, teacher certifications, and medical licensing, other courts have similarly found that Congress did not identify a history of unconstitutional disability discrimination when it enacted Title II. *See Alsbrook v. City of Maumelle*, 184 F.3d 999, 1009 (8th Cir. 1999) (no valid abrogation of Eleventh Amendment immunity in Title II suit against state agency regulating law enforcement officer certification: "[w]e do not think that the legislative record of the ADA supports the proposition that most state programs and services discriminate arbitrarily against the disabled."); *Digianni v. Spitzer*, 2006

24

WL 8439236, at *4 (E.D.N.Y. July 28, 2006), *aff'd,* 2009 WL 742133 (2d Cir. Mar. 23, 2009) (finding, in Title II case, that "there is no indication that Congress made a finding regarding a history and pattern of State discrimination against the disabled in state teacher certification practices when it passed the ADA."); *Guttman v. Khalsa,* 669 F.3d 1101, 1119 (10th Cir. 2012) (finding, in Title II case concerning a medical license, that "Congress has never specified a longstanding pattern of disability discrimination in professional licensing, much less any irrational discrimination that rose to the level of a constitutional violation. . . . Therefore, we find the history of unconstitutional discrimination against the disabled regarding their right to practice in their chosen profession, as reflected in the congressional record, is minimal."). Accordingly, I find that Congress did not identify a history and pattern of unconstitutional discrimination by states in the context of professional licensing and occupational choice when it enacted Title II.

### *Congruence and Proportionality*

Lastly, I consider whether the rights and remedies created by Title II are congruent and proportional both to the constitutional rights Title II purports to enforce and to the record of violations adduced by Congress. *T.W.*, 110 F.4th at 82.

With respect to the constitutional rights Title II purports to enforce, I find that the remedy "far exceeds what is constitutionally required." *T.W.*, 110 F.4th at 91. The abrogation of sovereign immunity here would impose on states and their agencies the burdens of engaging in interactive processes and making reasonable accommodations to their programs or services in cases where, as here, no Fourteenth Amendment violation would lie. *See Guttman,* 669 F.3d at 1124 ("The abrogation of sovereign immunity here would require states to justify a significant range of rational, everyday licensing decisions that would otherwise be constitutional."). It would also subject states and their agencies to litigation under Title II that would effectively impose a

25

heightened level of scrutiny on classifications affecting individuals with disabilities, which receive

only minimal scrutiny under the Fourteenth Amendment.

> Consider Title II's requirement . . . that a state make reasonable modifications in its programs, services or activities for qualified individuals with a disability unless the state can establish that the modification would work a fundamental alteration in the nature of the program, service, or activity. While the absence of a reasonable accommodation would be permissible under the Fourteenth Amendment so long as there were *any* rational basis for the absence, this provision of Title II allows but a single basis for not providing the accommodation: a showing that a fundamental alteration in the nature of the program, service, or activity would occur. Moreover, whereas under the Fourteenth Amendment the absence of an accommodation would be presumptively permissible with the burden of challenging it squarely on the plaintiff, Title II shifts the burden of proof onto the state to defend the absence. Indeed, this burden shift is consistent with the elevated scrutiny generally applied to suspect classifications such as race and nationality, suggesting that Title II is working a substantive elevation in the status of the disabled in equal protection jurisprudence.

*Garcia*, 280 F.3d at 109–10 (internal citations, quotation marks, and alterations omitted).

And because, as discussed above, Congress did not identify a history and pattern of

unconstitutional discrimination by states in the context of professional licensing and occupational

choice when it enacted Title II, the abrogation of sovereign immunity in this context would be

disproportionate to the lack of a record of violations adduced by Congress. *See T.W.,* 110 F.4th at

87 ("Considering the low level of scrutiny applied to the relevant right and the scant, nearly non-

existent record of constitutional violations, we find that abrogation of state sovereign immunity

would not be congruent and proportional in this case.").

In sum, Title II of the ADA does not validly abrogate sovereign immunity in the context

of a state police officer certification. "This case exhibits three factors that the Supreme Court has

found fatal to exercises of Section 5 power: the right at issue gets no heightened scrutiny, the

congressional record of unconstitutional conduct is slim, and the statute cuts far wider than the

Fourteenth Amendment." *T.W.*, 110 F.4th at 91. I therefore conclude that sovereign immunity bars

26

Therault's claim under Title II.[7]

### B. Count Two

The Town moves for summary judgment on Count Two, which alleges disability discrimination and failure to accommodate under Title I of the ADA. ECF Nos. 92 at 1; 92-1 at 14–28. Title I provides that "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). An employer is a "covered entity" under the ADA, and a "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(2), (8). Discrimination in violation of the ADA includes, among other things, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . or denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee . . ." *Id.* § 12112(b)(5).

"Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [ ] (1973)." *McBride*, 583 F.3d at 96. "A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate

---

[7] Because the Title II claim against the Council must be dismissed, I do not reach the Council's arguments regarding damages. *See* ECF No. 91-2 at 38–39.

non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Id*.

To establish a prima facie case for her Title I claim, Therault must demonstrate that: "(1) [she] is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, [she] could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Id.* at 97. "[T]he showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment is de minimis." *Cronin*, 46 F.3d at 203-04 (internal quotation marks omitted). "However, it is not non-existent and summary judgment must be granted whenever the undisputed facts, viewed most favorably to the non-moving plaintiff, do not make a prima facie case." *Robles*, 987 F. Supp. 2d at 206 (internal quotation marks and alterations omitted).

The Town does not dispute that the MPD was covered by the ADA, and for the purposes of its motion, it also does not dispute that Therault had a disability under the ADA or that MPD had notice of Therault's disability. ECF No. 92-1 at 15. The Town argues that Therault was not a qualified individual because (1) she could not perform the essential functions of the position even with reasonable accommodation and (2) her requested accommodations were unreasonable. For the reasons set forth below, I agree.

### i. Essential Functions

The Town correctly notes that whether Therault was a "qualified individual" depends on the "essential functions" of her job. ECF No. 92-1 at 15; 42 U.S.C. § 12111(8). The ADA instructs that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of

28

the job." 42 U.S.C. § 12111(8). "Essential functions are . . . the fundamental duties to be performed in the position in question, but not functions that are merely marginal. In approaching this inquiry, a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position. A reasonable accommodation can never involve the elimination of an essential function of a job." *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003) (internal citations, quotation marks, and brackets omitted). "Where a professional license is required as part of a qualification for a job, a lack of such license renders the employee unqualified for the position." *Dancause v. Mount Morris Cent. Sch. Dist.*, 2013 WL 2946063, at *3 (W.D.N.Y. June 14, 2013), *aff'd,* 590 F. App'x 27 (2d Cir. 2014).

POSTC certification would become essential, and required by state law, for Therault on September 8, 2022. ECF No. 100-2 ¶ 62 (Therault had until September 8, 2022 to complete the certification requirements under state law); Conn. Gen. Stat § 7-294d(a)(5) ("such basic training to be completed within one year following the appointment as a probationary candidate"). If Therault did not obtain the required certification by September 8, 2022, she would not be qualified to be a patrol officer. Conn. Gen. Stat § 7-294d(a)(5); *Dancause*, 2013 WL 2946063, at *3, *aff'd,* 590 F. App'x 27.

### ii.  Requested Accommodations

The Town argues that the accommodations that Therault claims she was denied—recycling and light duty—were unreasonable. ECF No. 92-1 at 18–19.

"The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment, including the existence of a vacant position for which she is qualified . . . at or around the time when accommodation was sought." *McBride*, 583 F.3d at 97. "A defendant is not required to offer an accommodation that imposes an undue hardship on its program's operation; it is only required

29

to make a reasonable accommodation. The ADA defines undue hardship as one requiring significant difficulties or expense when considered in light of a number of factors, one factor being the type of service or product being offered." *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 88 (2d Cir.), *opinion corrected,* 511 F.3d 238 (2d Cir. 2004) (internal citations omitted). And an employer need not violate the law to accommodate an employee. *See Shannon*, 332 F.3d at 102 ("We therefore see no inconsistency between the ADA and regulations governing bus driver qualifications. The federal agency that Congress has entrusted with determining minimum guidelines applicable to commercial motor vehicles has determined that the ability to distinguish the colors of traffic lights is essential, and nothing in the ADA calls this judgment into question.").

### *Recycling*

The Town argues that because Therault did not know when she would recover from her knee injury, and therefore also did not know when she would be able to complete the Police Academy and obtain certification, she "would not have been able to complete the essential job function of receiving her POSTC certification because, upon the information available to the parties at the time, it would not have been possible for her to do so within the one-year parameter established by law." ECF No. 92-1 at 22. The Town contends that any accommodation would, therefore, be for "an indefinite amount of time because her recovery was of unknown duration. Not only is this manifestly unreasonable as a matter of law, . . . but it also would have required Madison Police Department to act in contravention to state law by granting Plaintiff unlimited time to obtain POSTC certification whereas the regulation provides recruits with one year." *Id.*

I agree. The undisputed facts, even when viewed in the light most favorable to Therault, suggest that she would not have been able to obtain certification within the nine months she had remaining to do so. As of December 8, 2021, she had nine months left to complete the certification

30

requirements under state law, and the Academy plus field training would take at least that long. ECF No. 100-2 ¶ 62 (Therault had until September 8, 2022 to complete the certification requirements under state law); *id.* ¶ 43 (on December 8, 2021, MPD terminated Therault). The Police Academy would have taken about six months to complete, and the post-Academy field training would have taken her about 14–16 weeks. ECF No. 100-2 ¶¶ 18–19. Viewing the facts in the light most favorable to Therault, these requirements would take close to a combined nine and a half months. To recycle as of December 8, 2021, Therault would have had to start right away; but she had told the Town that her physical status had not changed as of December 8, 2021. ECF No. 100-2 ¶ 44 (as of December 8, 2021, Therault did not know how long she would be subject to the physical restrictions); *id.* ¶ 45 (as of December 8, 2021, MPD did not know when Therault would become physically able to complete the Council certification requirements); *id.* ¶ 46 (as of December 8, 2021, Therault had not provided MPD with an estimated time frame within which she would be able to return to the Police Academy); ECF No. 99-2 ¶¶ 40–41 (on December 6, 2021, Therault texted MPD Sergeant saying "my limitations have not changed." When asked whether POSTC was "letting [her] continue with training?" she responded, ". . . The doctor's limitations haven't changed. . ."). She still could not participate in most of the physical training exercises, and neither she nor the Town knew at the time when she would become able to do so. ECF Nos. 100-2 ¶¶ 44–46, 99-2 ¶¶ 40–41. She would have needed an extension from the Council to obtain POSTC certification, and there is no evidence that the Town had any influence over whether she would receive such an extension. Under these circumstances, the Town was not required to facilitate her recycling because it had no reason to believe that such an accommodation would enable to her secure POSTC certification by September 8, 2022.

*Light Duty*

The accommodation of light duty suffers from the same problem as recycling: it would not have permitted Therault to secure POSTC certification by September 8, 2022. Indeed, moving Therault to light duty would have postponed the start of her recycling, a delay that would have made it impossible for her to complete her academy and field training requirements by September 8, 2022. Accordingly, I find that Therault has not submitted evidence suggesting that recycling or light duty were available, let alone reasonable, accommodations. Summary judgment is therefore warranted and this claim is dismissed.

### C.  Counts Six and Twelve

The Town and MPD Chief Drumm move for summary judgment on the sex discrimination claims against them. The Town moves for summary judgment on Count Six, which alleges sex discrimination in violation of the CFEPA. The CFEPA states that "[i]t shall be a discriminatory practice in violation of this section [ ][f]or an employer . . . to discharge from employment any individual or to discriminate against any individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . sex . . ." Conn. Gen. Stat. § 46a-60(b)(1). Drumm moves for summary judgment on Count Twelve, which alleges a violation of equal protection under 42 U.S.C. § 1983.

> The Fourteenth Amendment provides public employees with the right to be free from discrimination. Consequently, public employees aggrieved by discrimination in the terms of their employment may bring suit under 42 U.S.C. § 1983 against any responsible persons acting under color of state law. To state a claim under § 1983, a plaintiff must allege two elements: (1) the violation of a right secured by the Constitution and laws of the United States, and (2) the alleged deprivation was committed by a person acting under color of state law. A state employee acting in his official capacity is acting under color of state law. Once the color of law requirement is met, a plaintiff's equal protection claim parallels [a] Title VII claim, except that a § 1983 claim, unlike a Title VII claim, can be brought against an individual.

*Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87–88 (2d Cir. 2015) (internal citations and quotation marks omitted).

Both of Therault's sex discrimination claims are evaluated under the burden-shifting framework of *McDonnell Douglas Corp. Id.* at 82–83; *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019) (sex discrimination claims under CFEPA "are evaluated under the burden-shifting framework set forth in *McDonnell Douglas* . . . for parallel federal claims under Title VII."). Under the *McDonnell Douglas* framework, Therault "bears the initial burden of establishing a prima facie case of discrimination." *Bently,* 935 F.3d at 88. To carry that burden, she must point to "sufficient evidence to permit a reasonable jury to find that (1) she is a member of a protected class, (2) she was qualified for the job at issue, (3) she was subjected to an adverse employment action, and (4) the circumstances of that adverse action give rise to an inference of discrimination based on her class membership." *Id.* If Therault can make a *prima facie* showing, the burden shifts to the Town to "articulate some legitimate, nondiscriminatory reason" for its action. *Id.* If the Town proffers such a reason, Therault "then bears the ultimate burden to show that the employer's proffered reason was merely a 'pretext for an unlawful motive.'" *Id.* at 88–89.

Therault's sex discrimination claims are based on a theory of disparate treatment. *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("A showing of disparate treatment—that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case."). She alleges she was treated less favorably because of her sex as compared to one male MPD employee who was injured during the same time period; was on workers' compensation; and was incapable of performing his official police duties for an extended period of time. ECF No. 36 ¶¶ 104–106, 210–212. The Town and Drumm argue that her

33

sex discrimination claim fails because the only comparator she has cited "is not sufficiently similarly situated to Plaintiff to support a discrimination claim." ECF No. 92-1 at 30, 36.

"A plaintiff relying on disparate treatment evidence 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" *Mandell*, 316 F.3d at 379. The Second Circuit has set forth the following test to determine whether a plaintiff is "similarly situated in all material respects" to the comparators she cites:

> What constitutes "all material respects" . . . must be judged based on (1) whether the plaintiff and those [s]he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness. In other words, there should be an objectively identifiable basis for comparability. Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical.

*Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (internal quotation marks omitted). "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Id.* at 39; *see also Mandell*, 316 F.3d at 379 (same). "This rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001); *see also Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) ("A court may grant summary judgment in a defendant's favor . . . where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated.").

Applying this standard, I agree with the Town and Drumm that no reasonable jury could find that Therault was similarly situated to the comparator she has identified. MPD Sergeant Guerra, who became injured and unable to perform his police duties in 2021, was permitted to take a medical leave of absence while he recovered from those injuries. ECF No. 100-2 ¶¶ 79, 81–83. At the time of his injury, Sergeant Guerra was certified by the Council and his certification

34

remained active during his leave of absence. *Id.* ¶¶ 80, 84–85. The Police Sergeant position oversees patrol officers and requires certification in addition to at least five years of experience. ECF No. 92-4 at 4 ¶ 19. Sergeant Guerra had approximately ten years of experience as a certified police officer at the time of his injury. *Id.* ¶ 22. Because Sergeant Guerra held a supervisory position as compared to Therault, held a position that Therault was unqualified for, and had been certified for approximately ten years, I find that no reasonable jury could conclude that Sergeant Guerra and Therault were similarly situated in all material respects or that they were subject to the same workplace standards, as Therault was a probationary candidate for patrol officer who lacked certification. *See Woods v. Newburgh Enlarged City Sch. Dist.*, 288 F. App'x 757, 760 (2d Cir. 2008) (plaintiff was not similarly situated to comparator in part because "the comparator held tenure whereas [the plaintiff]'s employment was probationary."); *Querry v. Messar*, 66 F. Supp. 2d 563, 572 (S.D.N.Y. 1999) ("Plaintiff and the sergeant were not similarly situated. The sergeant was of higher rank than the plaintiff and his duties were different from plaintiff's."); *Washington v. Cnty. of Onondaga*, 2009 WL 3171787, at \*26 (N.D.N.Y. Sept. 29, 2009) ("[comparator] was a senior officer, whereas Plaintiff was a sergeant. Based on their difference in rank, the two individuals cannot be said to be similarly situated in 'all material respects.'").

I therefore find that Therault's sex discrimination claims fail at the first step of the *McDonnell Douglas* framework because no reasonable jury could conclude that she and Sergeant Guererra were similarly situated and she has pointed to no other evidence upon which a reasonable jury could find infer that she was terminated based on her sex. *See Bentley,* 935 F.3d at 88 (plaintiff must "establish[] a prima facie case of discrimination . . . [t]o carry [her] burden on summary judgment"). I do not reach the issue of whether Drumm is entitled to qualified immunity because the sex discrimination claim fails on the merits.

### D. Count Nine

The Town moves for summary judgment on Count Nine, which alleges retaliation in violation of the CWCRA. The CWCRA prohibits, among other things, an employer from discharging an employee "because the employee has filed a claim for workers' compensation benefits." Conn Gen. Stat. § 31-290a(a).

"Analysis of a retaliation claim under Conn. Gen. Stat. § 31-290a follows the *McDonnell Douglas* burden-shifting framework." *Montague v. Sodexco, Inc.*, 2017 WL 4476969, at *20 (D. Conn. Oct. 6, 2017). To establish a prima facie case of retaliation, Therault must establish "(1) that [she] has filed a claim for workers' compensation benefits . . . (2) there was an adverse employment action taken against [her], and (3) there was a causal connection between the protected activity and the adverse employment action." *Muoio v. Costco Wholesale Corp.*, 2015 WL 222160, at *14 (D. Conn. Jan. 14, 2015); *see Callender v. Reflexite Corp.*, 70 A.3d 1084, 1093 (Conn. App. 2013), *cert. denied*, 75 A.3d 32 (Conn. 2013). "If [the] plaintiff establishes a prima facie case, [the] defendant must articulate a legitimate, non-retaliatory reason for the challenged employment decision; [the] plaintiff must then point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Lorius v. Amedisys Holding, L.L.C.*, 2018 WL 5268116, at *6 (D. Conn. Oct. 23, 2018) (internal quotation marks omitted).

The Town concedes that Therault filed a workers' compensation claim and that it took adverse action against her. ECF No. 92-1 at 33. The Town argues that summary judgment is warranted, however, because there are no facts to suggest that MPD acted with a retaliatory motive based on Therault's workers' compensation claim besides the "admittedly close temporal proximity" between filing her workers' compensation claim and being fired. ECF No. 104 at 9; *see also* ECF No. 92-1 at 33. The parties' dispute, then, centers only on the causation element of

Therault's prima facie retaliation case.

"A causal connection may be established either indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by a defendant." *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991) (quotation marks and emphasis omitted). To show causation based on temporal proximity, the retaliatory conduct must have followed "very close" in time after the employer learned that the employee engaged in protected activity. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). The Second Circuit has not established a "bright line to define the outer limits beyond which a temporal relationship is too attenuated." *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013). Thus, the Court may "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009).

Here, MPD fired Therault less than one month after she filed her workers' compensation claim. ECF No. 100-2 ¶ 26 (Therault filed workers' compensation claim on November 13, 2021); *id.* ¶ 43 (MPD terminated Therault on December 8, 2021). Viewing the record in the light most favorable to Therault, I find that a reasonable jury could infer from this timeline that MPD fired Therault as retaliation for filing her workers' compensation claim. *See Knox v. CRC Mgmt. Co., LLC*, 134 F.4th 39, 50 (2d Cir. 2025) ("Interpreting the entire record in the light most favorable to Knox, we find that a rational jury could infer a causal connection from the roughly one-month period between Knox's protected activity and her firing."). Accordingly, I find that Therault has established a prima facie retaliation claim.

I next consider the Town's articulated reason for firing Therault and whether Therault has

pointed to evidence that would be sufficient to permit a reasonable jury to find that MPD's explanation is pretextual. *See Lorius*, 2018 WL 5268116, at *6; *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013) ("Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage.") (internal citation omitted); *Knox*, 134 F.4th at 50 ("To survive summary judgment [after the defendant has articulated a nonretaliatory reason for her firing], [the plaintiff] cannot rely solely on temporal proximity.").

The Town contends that it fired Therault because "she would not be able to obtain POSTC certification within the one-year period provided by law." ECF No. 92-1 at 34. For the reasons discussed with respect to Count Two, as of December 8, 2021, the Town had no reason to believe that Therault would obtain her certification from the Council by the deadline to do so and therefore had a legitimate reason to terminate Therault's employment. All the evidence points to the Town's stated reason for Therault's termination as the true reason the Town terminated her. Therault has pointed to no evidence that the Town treated her differently due to her filing a workers' compensation claim. The Town did not oppose the claim. And the termination letter stated that the MPD would keep her application on file for a year and invited her to apply for any positions for which she was qualified—an odd invitation if the Town harbored retaliatory intent. Therault has submitted no other evidence to suggest that the Town's stated reason for firing her was pretextual, and no reasonable juror could conclude that it was. Accordingly, the motion for summary judgment on this count is granted and the claim is dismissed.

### E. Count Eleven

Council Director Fasano moves for summary judgment on Count Eleven, which alleges a violation of due process under 42 U.S.C. § 1983. *See* ECF No. 72 at 27–28 (permitting stigma-plus procedural due process claim to proceed against Fasano).

38

"[A] probationary employee can invoke the protections of the Due Process Clause where that employee has suffered a loss of reputation coupled with the deprivation of a more tangible interest, such as government employment . . . without adequate process." *Segal v. City of New York*, 459 F.3d 207, 212 (2d Cir. 2006) (internal citation and quotation marks omitted). "Such an action is referred to as a stigma-plus claim," *id.,* and is the basis for Therault's due process claim. ECF Nos. 72 at 26-28; 99 at 17.  Her stigma-plus claim requires she satisfy three elements:

> First, the plaintiff must . . . show that the government made stigmatizing statements about [her]—statements that call into question [her] good name, reputation, honor, or integrity. . . . Second, a plaintiff must prove these stigmatizing statements were made public. Third, the plaintiff must show that the stigmatizing statements were made concurrently with, or in close temporal relationship to, [her] dismissal from government employment.

*Segal*, 459 F.3d at 212 (citations, internal quotation marks, and emphasis omitted). Therault "also must demonstrate that her liberty was deprived without due process of law. Stated differently, the availability of adequate process defeats a stigma-plus claim." *Id.* at 213. Fasano contends that summary judgment is warranted because Therault failed to exhaust her administrative remedies; his statements were not false or stigmatizing; and he is entitled to qualified immunity. ECF No. 91-2 at 31-37. Because the statements underlying this claim were not stigmatizing, this claim must be dismissed.

Fasano argues that Therault's stigma-plus claim fails "because there is no evidence of a false statement that injured the Plaintiff's reputation." ECF No. 91-2 at 32. As an initial matter, a plaintiff bringing a stigma-plus claim is not required to prove that the allegedly stigmatizing statement was false. *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004) ("A plaintiff generally is required only to raise the falsity of these stigmatizing statements as an issue, not prove they are false."); *Brandt v. Bd. of Co-op. Educ. Servs.,* 820 F.2d 41, 43–44 (2d Cir. 1987) (finding that plaintiff satisfied requirement of raising issue of falsity by alleging it in his complaint: "The

truth or falsity of the charges would then be determined at the hearing itself. If [the plaintiff] had to prove the falsity of the charges *before* he could obtain a hearing, there would be no need for the hearing."). But even if Therault was required to prove that Fasano's statements were false, she has raised a material dispute of fact as to the statements' falsity. Fasano notified the MPD that "Since the start of the academy, Recruit Therault has missed a total of 48.75 hours. 2.75 hours were restored . . . reducing her missed hours to 46. The breakdown of her missed hours are as follows . . . Due to the recruit missing an excess of 40 hours and per regulation Recruit Therault is being dismissed from session 373 effective 12/08/2021." ECF No. 91-11 at 2–3. After she injured her knee, however, Therault continued to physically attend sessions at the Academy. ECF No. 99-2 ¶ 12 (response noting that "Plaintiff remained present and participated in activities her restrictions permitted . . ."); *id.* ¶ 13 ("After her knee injury, Plaintiff attended the Academy training course . . ."); *id.* (response noting that "Plaintiff attended the Academy and participated in those physical activities her medical restrictions permitted . . . Plaintiff also participated in classroom instruction while present."); ECF No. 100-2 ¶ 38 ("Plaintiff continued to attend the Police Academy; for some sessions, she was physically present but not allowed to participate in physical activity and was marked absent by instructors."). Interpreting these facts in the light most favorable to Therault, a reasonable jury could conclude that Fasano's statements about Therault "missing" over 40 hours were false because she did not actually "miss" sessions—she attended the Academy training courses but her participation was physically limited by her injury.

I agree with Fasano, however, that his statements were not stigmatizing. ECF No. 91-2 at 33–34. The Second Circuit has held that statements that "denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her

40

profession" will satisfy the stigma requirement. *Segal*, 459 F.3d at 212. In other words,

> Not every derogatory statement made about an employee who loses his or her job imposes sufficient stigma to implicate the liberty interest and require a name-clearing hearing . . . stigmatization giving rise to a cause of action require[s] something considerably graver than a charge of failure to perform a particular job, lying within the employee's power to correct. . . . governmental allegations of professional incompetence, made in connection with an employee's termination, will not support a cause of action for a name-clearing hearing unless the allegations go to the very heart of the employee's professional competence, and threaten to damage his professional reputation, significantly impeding his ability to practice his profession.

*O'Neill v. City of Auburn*, 23 F.3d 685, 691–93 (2d Cir. 1994) (internal citations, quotation marks, and alterations omitted). The Second Circuit has also held that where "stigma" arises from an employer's actions, rather than its statements, "negative inferences" that members of the community may draw from the employer's actions do not make a statement stigmatizing. *O'Connor v. Pierson*, 426 F.3d 187, 195 (2d Cir. 2005) ("Even if O'Connor is correct that townsfolk drew negative inferences from his suspension, this is not enough to make out a stigma-plus claim.").

Applying this standard, courts have found that statements that specifically cite the ways in which an employee is incompetent, and those that go directly to the plaintiff's reputation for honesty and morality, are stigmatizing. *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 631 (2d Cir. 1996) ("the statement of reasons for termination reads like a bill of indictment, methodically reciting a litany of lack of professional competence . . . the comments . . . are so harsh as to be likely to persuade any other school board not to hire plaintiff as a supervisor."); *Holmes v. Town of E. Lyme*, 866 F. Supp. 2d 108, 126 (D. Conn. 2012) ("accusations of theft of services . . . about a scheme Plaintiff had for getting paid improperly . . . directly addressed Plaintiff's reputation for honesty and morality . . . [and] were unquestionably stigmatizing.").

In contrast, vague statements of unspecified incompetence and statements regarding personnel decisions and workplace requirements are not stigmatizing, even if they may lead to speculation and negative inferences about the plaintiff. *O'Neill*, 23 F.3d at 693 (finding that statements about a civil engineer that "were vague and did not specify which aspects of his job he was 'incompetent' to perform" did not "impugn[] his professional reputation as a licensed engineer or impair[] his ability to find future employment within his profession."); *Leichter v. Lebanon Bd. of Educ.*, 917 F. Supp. 2d 177, 190 (D. Conn. 2013) (statements "informing staff that the Plaintiff was placed on administrative leave . . . and instructing staff to refrain from communicating with the Plaintiff while he was on leave . . . are not the type of false reputation-tarnishing statements sufficient to support a stigma-plus due process claim. The fact that an innocuous statement may . . . lead to unwarranted speculation does not make the statement stigmatizing."); *Linardos v. Juthani*, 2025 WL 887693, at *10 (D. Conn. Mar. 21, 2025) ("[L]etter stating 'Before you may return to work, you must provide evidence of your fitness to resume work activities certifying that you are not a threat to yourself or others,' does not make an accusation about Ms. Linardos, let alone a statement sufficiently derogatory to injure her reputation . . . While Ms. Linardos may argue that this statement, by implication, falsely portrays her as a threat to herself or others, the fact that an innocuous statement may . . . lead to unwarranted speculation does not make the statement stigmatizing.") (internal citations, alterations, and quotation marks omitted).

Here, the allegedly stigmatizing statements Fasano made were that Therault "missed" over 40 hours of Academy sessions. ECF No. 91-11 at 2–3. These statements do not "go to the very heart" of her "professional competence." *O'Neill*, 23 F.3d 692. In fact, they do not seem to go to her professional competence at all, especially considering that the letter in which the statements appear suggests that Therault's "missed hours" were a result of her knee injury. ECF No. 91-11 at

3 (noting that Fasano had met with Therault to "determine if there would be any modifications to [her] physical restrictions" and that Therault had an "MRI scheduled . . . [and a] doctor's appointment . . . [and] an inability to move comfortably laterally and felt the injury was a potential meniscus injury."). Accordingly, I find that no reasonable jury could find that Fasano's statements "impugn[ed] [Therault's] professional reputation in such a fashion as to effectively put a significant roadblock in [her] continued ability to practice . . . her profession." *Segal*, 459 F.3d at 212. Because Therault's stigma-plus claim fails for lack of stigma, I do not reach the issues of whether she was afforded due process or whether Fasano is entitled to qualified immunity.

## V.    Conclusion

For the reasons set forth above, the motions for summary judgment are GRANTED.  The Clerk is instructed to close the case.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Hartford, Connecticut
July 16, 2026